[Cite as *State v. Lewis*, 2017-Ohio-2747.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | | C.A. No. 28064 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| JOHN LEWIS | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR 2014 08 2465 |

DECISION AND JOURNAL ENTRY

Dated: May 10, 2017

TEODOSIO, Judge.

{¶1} Defendant-Appellant, John Lewis, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} Mr. Lewis and his former girlfriend, the victim in this matter, began dating in 2007 and lived together at various points in time. Mr. Lewis described their relationship in positive terms and indicated that the two were still communicating and working on their problems when the incident giving rise to this appeal occurred. Meanwhile, the victim testified that she had tried repeatedly to end their relationship, but Mr. Lewis persistently called her, showed up at her workplace, and came to her home. There is no dispute that, on the evening of August 2, 2014, Mr. Lewis came to the victim's house in his truck. By the end of the evening, the victim was suffering from a dislocated knee, a fractured tibia, and facial swelling while Mr. Lewis was suffering from a broken pinkie finger.

{¶3} According to Mr. Lewis, he picked up the victim on August 2nd because they had plans to go to his house and watch a movie. He testified that, after they arrived at his home, the victim fell from his raised back porch and he fell attempting to catch her. Mr. Lewis acknowledged that the victim injured her leg during the fall, but claimed that she would not allow him to call an ambulance because of the cost. It was his testimony that they planned to go to the hospital after they relaxed in his basement, but that he was later forced to call 911 because he could not carry the victim upstairs.

{¶4} According to the victim, she and Mr. Lewis did not have plans the evening of August 2nd, but he came to her house after repeatedly calling her and her roommate's cell phones. She testified that she went outside to speak with Mr. Lewis and got into his truck because he claimed that he needed help with something. She testified that she protested when Mr. Lewis drove away, but that he continued to drive until he brought her to his house. When she refused to exit his truck, he repeatedly punched her and dragged her from the vehicle. She testified that she injured her leg falling from his porch in an attempt to escape from him. Although she immediately experienced severe pain, Mr. Lewis took her cell phone, brought her into his basement, and refused to call for help. There is no dispute that Mr. Lewis did not call 911 until 5:01 a.m. the following morning.

{¶5} A grand jury indicted Mr. Lewis on one count each of kidnapping, felonious assault, abduction, menacing by stalking, and domestic violence. The matter proceeded to trial, and a jury found Mr. Lewis guilty on all counts. The parties agreed that the offenses of kidnapping and abduction were allied offenses of similar import, as were the offenses of felonious assault and domestic violence. After the State elected to proceed on the counts of

kidnapping and felonious assault, the trial court sentenced Mr. Lewis on those two counts and his menacing by stalking count. The court sentenced him to a total of 13 years in prison.

{¶6} Mr. Lewis now appeals from his convictions and raises three assignments of error for our review. For ease of analysis, we rearrange several of the assignments of error.

II.

## ASSIGNMENT OF ERROR ONE

THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED REVERSIBLE ERROR BY DENYING THE BATSON CHALLENGE SUBMITTED BY MR. LEWIS IN VIOLATION OF THE DUE PROCESS CLAUSE AND THE EQUAL PROTECTION CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE 1, SECTION 2 OF THE OHIO CONSTITUTION[.]

{¶7} In his first assignment of error, Mr. Lewis argues that the trial court erred when it allowed the State to exercise a peremptory challenge against Juror Number 10, an African American male. We disagree.

{¶8} "The Equal Protection Clause of the United States Constitution prohibits deliberate discrimination based on race by a prosecutor in his exercise of peremptory challenges." *State v. Campbell*, 9th Dist. Summit No. 24668, 2010-Ohio-2573, ¶ 33, citing *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). "'A court adjudicates a *Batson* claim in three steps.'" *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, ¶ 61, quoting *State v. Murphy*, 91 Ohio St.3d 516, 528 (2001).

> In the first step, a defendant must make a prima facie showing that the [S]tate has exercised a peremptory challenge on the basis of race. Once the prima facie showing has been made, the State must offer a basis for striking the prospective juror that is race-neutral. Finally, the trial court must consider the parties' positions to determine whether the defendant has demonstrated purposeful discrimination.

(Internal citations omitted.) *State v. Jackson*, 9th Dist. Summit No. 27739, 2017-Ohio-278, ¶ 6. "This Court reviews whether a party exercised its peremptory challenges in a discriminatory manner under the clearly erroneous standard." *State v. Payne*, 9th Dist. Summit No. 26655, 2013-Ohio-5230, ¶ 19, citing *Hernandez v. New York*, 500 U.S. 352, 364-365 (1991).

{¶9} At the start of voir dire, the trial court asked the prospective jurors whether any of them had ever been convicted of a felony-level offense. Juror Number 10 then responded that he had been convicted of a felony in 2013 or 2014.[1] He later elaborated that he had been convicted in the courtroom "right next-door here." When the prosecutor expressed concern to the juror about his ability to be fair and impartial, Juror Number 10 stated that his case would not be an issue for him. He indicated that he knew he "did wrong" in his case. He also agreed that he was treated fairly by the police and prosecution in his case.

{¶10} When the trial court asked the State for its peremptory challenges, the State asked to excuse Juror Number 10. Defense counsel then objected on the basis of *Batson* and asked the State to provide a race-neutral explanation. The State indicated that it was excluding Juror Number 10 because he had been convicted fairly recently of a serious felony in a nearby courtroom. The prosecutor stated: "Although [Juror Number 10] said he felt he could be fair, we felt that [], the nature of the charges and the proximity in time give us some concern about his ability to be a fair juror." In response, defense counsel argued that Juror Number 10 had conceded his guilt in his prior case and had denied that it would have any influence on his ability to remain fair and impartial. The trial court then determined that the State had provided a race-neutral explanation and overruled the *Batson* challenge.

---

[1] The nature of Juror 10's conviction is unclear from the record. Although Juror 10 indicated that he had been convicted of attempted murder, the State later indicated that he was convicted of burglary and theft.

{¶11} Mr. Lewis argues that the Equal Protection Clause was offended when the trial court allowed the State to "singl[e] out Juror [Number] 10 for no reason other than he had a felony conviction * * *." Yet, "a peremptory challenge may be exercised for *any* racially-neutral reason." (Emphasis sic.) *State v. Moss*, 9th Dist. Summit No. 24511, 2009-Ohio-3866, ¶ 12. The State specifically sought to remove Juror Number 10 because he had a recent, serious felony-level conviction, his conviction took place in the same courthouse, and it had concerns about his ability to remain fair and impartial. There is no indication in the record that the State possessed a discriminatory intent when it sought to remove Juror Number 10 from the venire. *See State v. Walton-Kirkendoll*, 9th Dist. Lorain No. 16CA010907, 2017-Ohio-237, ¶ 14, quoting *Hernandez*, 500 U.S. at 360. Moreover, both this Court and others have recognized that "'[r]emoving a juror based on [his] past criminal history * * * is a valid, race-neutral reason for raising a peremptory challenge.'" *State v. Lacey*, 7th Dist. Mahoning No. 10MA122, 2012-Ohio-1685, ¶ 127, quoting *State v. Santiago*, 10th Dist. Franklin No. 02AP-1094, 2003-Ohio-2877, ¶ 10. *See also State v. Smith*, 9th Dist. Lorain No. 96CA006331, 1998 WL 158966, *9 (Mar. 25, 1998) (prospective juror's criminal record constituted race-neutral basis for peremptory challenge). Having reviewed the record, we cannot conclude that the trial court erred by overruling Mr. Lewis' *Batson* challenge. Mr. Lewis' first assignment of error is overruled.

## ASSIGNMENT OF ERROR THREE

> MR. LEWIS' CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE POSSESSION (sic) IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT OF THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

**{¶12}** In his third assignment of error, Mr. Lewis argues that his convictions for kidnapping, abduction, felonious assault, and domestic violence are against the manifest weight of the evidence. We disagree.

**{¶13}** When a defendant asserts that his conviction is against the manifest weight of the evidence:

> [A]n appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

**{¶14}** Initially, we note that Mr. Lewis, in setting forth his argument, asserts several times that the State set forth "no evidence" to support certain elements of his convictions. He contends both that the trier of fact lost its way and that the State "failed to prove all elements of the crimes charged beyond a reasonable doubt." The latter argument, however, sounds in sufficiency rather than weight. *See State v. Bressi*, 9th Dist. Summit No. 27575, 2016-Ohio-5211, ¶ 25 ("Sufficiency concerns the burden of production and tests whether the prosecution presented adequate evidence for the case to go to the jury."). Because Mr. Lewis' stated assignment of error presents this Court with strictly a weight challenge and because that is the only standard of review that he sets forth in his brief, we limit our review to that issue. *See State*

*v. Poland*, 9th Dist. Medina No. 14CA0003-M, 2014-Ohio-5737, ¶ 24. *See also State v. Kepich*, 9th Dist. Summit No. 27520, 2015-Ohio-1920, fn. 1.

{¶15} A person commits kidnapping when he, "by force, threat, or deception, * * * remove[s] another from the place where the other person is found or restrain[s] the liberty of the other person * * * [t]o facilitate the commission of any felony * * *." R.C. 2905.01(A)(2). An abduction occurs when a person, "without privilege to do so, [] knowingly[,] * * * [b]y force or threat, restrain[s] the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear * * *." R.C. 2905.02(A)(2). A felonious assault occurs when a person "knowingly * * * [c]ause[s] serious physical harm to another * * *." R.C. 2903.11(A)(1). If the person "knowingly cause[s] * * * physical harm to a family or household member," his actions constitute domestic violence. R.C. 2919.25(A).

{¶16} The victim here testified that she knew Mr. Lewis for about seven years before the events giving rise to this matter occurred. The two dated for much of that time and lived together for part of that time. As their relationship progressed, the victim found Mr. Lewis to be increasingly controlling. She testified that he struck her for the first time at some point before April 2013, when she was living on her own at an apartment on Dayton Street. She also described a separate incident where Mr. Lewis slammed her hand in a car door and broke her finger. She stated that it was impossible to break ties with Mr. Lewis because he would constantly call her, show up unannounced at her place of employment, and come to her home and "beat on the door."

{¶17} On the evening of August 2, 2014, the victim arrived home from work. At that time, she resided with her roommate who was a close, personal friend. The victim testified that Mr. Lewis repeatedly called her cell phone that evening, but she ignored his calls. He then began

calling her roommate's phone, but she instructed her roommate not to answer. A little while later, the victim heard a loud truck arrive outside, recognized it as Mr. Lewis', and decided to go outside and speak to him. Although the victim initially stood outside Mr. Lewis' truck to speak with him, he eventually convinced her to get into the truck. The two spoke for a few more minutes before Mr. Lewis began driving away. The victim stated that she asked Mr. Lewis where he was taking her and told him that she did not want to go anywhere with him, but Mr. Lewis did not respond. Instead, he drove her to his residence on Springdale Street.

{¶18} Once she and Mr. Lewis arrived at his residence, Mr. Lewis repeatedly attempted to convince the victim to come inside. The victim, however, refused to exit the truck. Mr. Lewis then exited the truck, walked to the passenger's side, opened the victim's door, and grabbed her with both hands. As the victim struggled to remain inside the truck and threatened to scream if Mr. Lewis did not release her, Mr. Lewis struck her in the face. The victim testified that Mr. Lewis repeatedly hit her in the face before grabbing her by the hair and dragging her towards the back door of the house. Mr. Lewis led the victim up the back stairs and onto his raised porch. Before he could open the door to the house, however, the victim shook herself loose from Mr. Lewis and jumped from the porch. In doing so, she seriously injured her knee.

{¶19} The victim described the pain in her knee as the worst that she had ever experienced. She indicated that the pain made it difficult to remember the details that followed, but she recalled Mr. Lewis taking her into the basement of his home. She testified that she begged Mr. Lewis numerous times to take her to the hospital, but he did not respond. Additionally, because Mr. Lewis took her cell phone, the victim could not call for help herself. She testified that Mr. Lewis looked through her cell phone and questioned her about her text messages as she suffered. Finally, somewhere around 5:00 a.m. the following morning, Mr.

Lewis called 911. When the victim finally received treatment, she learned that she needed surgery for a dislocated knee and a fractured tibia. She also suffered from a black eye and swelling to the right side of her face.

{¶20} The paramedic and EMT who responded to Mr. Lewis' home both testified that the victim was experiencing extreme pain when they arrived. The paramedic described the victim as being upset and "slow to answer questions." He confirmed that the victim's self-professed boyfriend remained close by while he attempted to ask the victim about her injuries. When he asked the victim how she had been hurt, she stated that she had fallen off the back porch. The paramedic indicated that he found her response odd because he did not understand why she was in the basement if she was injured outside. He testified that, in his experience as a paramedic, it is not uncommon for abuse victims to deny any accusations of assault when their assailants are present. He recalled that it was difficult to remove the victim from the basement because they had to carry her out and she was screaming from the pain in her knee.

{¶21} The emergency room physician who treated the victim at the hospital testified that she had "an obvious deformity of her knee" and was in a lot of pain. He stated that he had to ask the victim a number of times what had happened because, initially, she was hesitant to describe specifically how she had been injured. After he spoke with her for a while longer, however, the victim finally admitted that she had been assaulted.

{¶22} The same day that he treated the victim, the physician also treated Mr. Lewis for a broken pinkie finger. He testified that Mr. Lewis sustained what is commonly referred to as a "boxer's fracture," so named because it is "a punching type fracture." The physician agreed that Mr. Lewis' injury would be consistent with either punching someone or falling onto a hard surface with a clenched fist.

{¶23} Officer Dawn Forney was dispatched to the hospital to speak to the victim after the hospital staff learned that she had suffered an attack. She testified that the victim's right knee was splinted and she had bruising and swelling to her face, scratches to the neck, and scrapes to the elbow. She described the victim as being "obviously upset" and observed that she "seemed generally in fear." The victim described how her boyfriend had punched her in the face when she refused to get out of his truck. She further described resisting her boyfriend as he pulled her onto the back porch area and falling from the porch as she attempted to get away. The victim informed Officer Forney that she was unable to walk after the fall and that her boyfriend took her to his basement and kept her there for several hours before calling for help. Officer Forney stated that the victim knew her boyfriend was also receiving treatment at the hospital and was afraid he might come into her room.

{¶24} Following Officer Forney's interview, Detective John Bell was assigned to investigate the matter. Detective Bell spoke to the victim at the hospital a few hours after she was admitted. He described her as "distressed, scared" and stated that he could see visible swelling to the right side of her face. He learned from the victim that Mr. Lewis, her boyfriend, had beaten her. The victim described how Mr. Lewis took her to his residence and tried to convince her to come inside. She further described how, when she refused to get out of the truck, Mr. Lewis repeatedly punched her and dragged her to the back door of his house. The victim told the detective that she fell from Mr. Lewis' patio and broke her leg while trying to break away from him. She stated that Mr. Lewis then took her into his basement and took her cell phone from her. The victim estimated that Mr. Lewis brought her to his house at about 10:00 p.m. that evening, but Detective Bell noted that Mr. Lewis did not call 911 until just after 5:00 a.m.

{¶25} As a part of its case in chief, the State played the 911 call that Mr. Lewis placed. During the call, Mr. Lewis asked the dispatcher to send an ambulance because there was a woman with an injured knee. He also informed the dispatcher that he thought he broke his hand attempting to catch the woman. Mr. Lewis expressed to the dispatcher his concern that the victim kept screaming and that one of his neighbors might call the police if they mistakenly believed that her screams were due to an altercation.

{¶26} Detective Bell testified that he spoke with Mr. Lewis on the phone a few days after this incident occurred. During their conversation, Mr. Lewis stated that he picked up the victim on the evening of August 2nd because the two had plans to talk about their relationship problems. According to Mr. Lewis, he took the victim to a restaurant and then brought her to his house because he remodeled and wanted to show her. He stated that the victim tripped on a bucket while he was opening his back door and that he grabbed her as she fell from the porch. He stated that he was unable to keep his balance, so he fell along with her and injured his hand as they hit the ground. Mr. Lewis told the detective that he brought the victim into the basement and gave her a pain reliever for her knee, but did not call 911 because she was worried about the cost of an ambulance ride. He stated that he let the victim rest in the basement while he washed her clothes for the hospital. When it was time to go, however, he could not get the victim up the stairs by himself. He then went to the local gas station to look for someone to help him carry her upstairs. When that plan failed, he called 911.

{¶27} The victim's roommate also testified on behalf of the State. She described herself as the victim's best friend for the last 27 years and testified that she was acquainted with Mr. Lewis through the victim. She indicated that she initially found Mr. Lewis to be nice, but later changed her mind. She described how the victim's demeanor changed as her relationship with

Mr. Lewis continued. Specifically, she found that the victim was "always scared and worrying" as time went on. She indicated that the victim would try ending her relationship with Mr. Lewis, but that he "would stalk her" by constantly calling her and coming to her house. She stated that she was at home with the victim on August 2nd when Mr. Lewis repeatedly called their cell phones and then showed up in his truck. She testified that, as Mr. Lewis sat outside and blew his horn, the victim decided she would go out and talk to him. She testified that the victim appeared to be very scared as she walked outside. Although she repeatedly tried to call the victim's cell phone as the night wore on, the victim never answered.

{¶28} One of the victim's co-workers and her boss also testified for the State. Her co-worker testified that he had worked with the victim for the past six years and knew Mr. Lewis because he would come into the store on occasion to speak with the victim. He testified that the victim's relationship with Mr. Lewis began to sour in 2013 and that the victim lost focus at work. He testified that there were times the victim would answer a call at work and "[t]he moment she would get on the phone her demeanor would change, and you knew who she was talking to." He testified that Mr. Lewis was eventually banned from the store, but that he would still drive up and down the street there. He specified that the store had large front windows, such that the employees could easily see a car from the street. He also testified that, occasionally, Mr. Lewis "would just appear around the corner of the building as we were sitting out there smoking."

{¶29} The victim's boss testified that the victim was an excellent employee, but lost her focus as her relationship with Mr. Lewis deteriorated. She testified that Mr. Lewis initially appeared to be a nice guy and frequently would bring the store employees lunch when he came to visit. By summer 2013, however, there was a dramatic shift, and Mr. Lewis became very possessive. The victim's boss testified that Mr. Lewis would constantly call the store and

interrupt the victim while she was working. She testified that she had to confront Mr. Lewis after the victim lost her store keys because she thought Mr. Lewis had them. The victim's boss testified that Mr. Lewis initially denied taking the keys, but, when she threatened to call the police, he told her it was not her business. According to the victim's boss, Mr. Lewis told her to "stay the f*** out of it" and warned that, if she did not, "he would kill [her] and * * * burn the place to the ground." The victim's boss confirmed that she banned Mr. Lewis from the store after the incident regarding the keys. Nevertheless, she confirmed that Mr. Lewis would still drive to the area and sit in his truck in one of the nearby parking lots. She testified that she made sure the victim was never alone at the store.

{¶30} In his defense, Mr. Lewis presented the testimony of several former neighbors and a friend, all of whom were somewhat familiar with the victim from the time that she and Mr. Lewis lived together. None of the individuals who testified mentioned any instances where they noted any point of concern regarding Mr. Lewis and the victim's relationship. They each admitted, however, that they had extremely limited interactions with the victim or simply saw her from a distance on occasion.

{¶31} Mr. Lewis also testified in his own defense. He stated that he and the victim started dating in 2007 and began living together in 2009. According to Mr. Lewis, the victim never formally moved out of his house, but would stay elsewhere on occasion before returning. He testified that he picked up the victim on August 2nd because they had plans to go back to his house and watch a movie. He testified that he led the victim up his back stairs and tried to keep a hand on her because there were items strewn around his raised porch. As he reached to open the door, he heard the victim stumble and hit a bucket on the porch. According to Mr. Lewis, he

immediately reached back to catch the victim, but she fell from the porch and brought him down with her.

{¶32} Mr. Lewis testified that both he and the victim stood up after the fall, and the victim indicated that she had hurt her knee. He testified that the victim was able to walk with assistance, and he brought her down to his basement and gave her a pain reliever. According to Mr. Lewis, the victim dirtied her clothes when she fell, so he removed them and washed them so that he could take her to the hospital. He testified that he waited to take her to the hospital because her knee injury did not appear to be that bad and she was able to relax once he gave her a pain reliever. He stated that the two watched television and later had sexual intercourse. As the evening wore on, however, the victim's discomfort worsened, and Mr. Lewis thought they should call an ambulance. Mr. Lewis claimed that the victim did not want him to call for an ambulance because she could not afford the bill. He testified that he later left and walked to the gas station to try to find someone to help him carry the victim out of the basement. Yet, he ultimately called for an ambulance because the victim was "in a little bit of pain" and it was too risky to move her.

{¶33} Mr. Lewis acknowledged that he also received treatment at the hospital for an injury to his left hand. He denied, however, that he ever punched the victim. He also denied stalking the victim, harassing her with phone calls, or being banned from her workplace. He acknowledged that he sometimes drove to the area where the victim worked, but testified that he did so because it was located nearby other businesses that he frequented. He stated that he had no idea why the victim had accused him of assault because their relationship "was great."

{¶34} Mr. Lewis challenges his convictions for kidnapping, abduction, felonious assault, and domestic violence as being against the manifest weight of the evidence. He argues that the

evidence was such that the victim voluntarily got into his truck and accompanied him to his house without him forcing her to do so. He further argues that the victim was unable to testify that he kept her against her will because she admitted that she could not remember much of what happened in the basement. As for the felonious assault and domestic violence charges, he argues that the victim either fell or jumped from his porch on her own. He notes that the emergency room physician who examined both him and the victim admitted that their injuries were consistent with a fall.

{¶35} Having reviewed the record, we cannot conclude that the jury lost its way when it convicted Mr. Lewis of kidnapping, abduction, felonious assault, and domestic violence. Multiple witnesses testified that Mr. Lewis engaged in stalking behavior once the victim tried to end their relationship. The jury also heard the victim testify that: (1) she repeatedly told Mr. Lewis she did not want to go with him on the evening of August 2nd and did not want to go into his house; (2) Mr. Lewis punched her in the face multiple times before dragging her from his truck; (3) she injured her knee attempting to escape Mr. Lewis; (4) she suffered immediate and severe pain from her injury; and (5) Mr. Lewis took her cell phone and kept her in his basement for over seven hours before finally calling 911. Although Mr. Lewis denied all of the victim's accusations and claimed they had a "great" relationship, "the trier of fact [was] in the best position to determine the credibility of witnesses and evaluate their testimony accordingly." *State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15. This Court "will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version." *State v. Barger*, 9th Dist. Medina No. 14CA0074-M, 2016-Ohio-443, ¶ 29. Because Mr. Lewis has not shown that this is the exceptional case where the jury lost its way by convicting him, we reject his

argument that his convictions are against the manifest weight of the evidence. *See Otten*, 33 Ohio App.3d at 340. His third assignment of error is overruled.

## ASSIGNMENT OF ERROR TWO

THE TRIAL COURT ERRED AS A MATTER OF LAW BECAUSE THE STATE FAILED TO ESTABLISH ON THE RECORED (sic) SUFFICIENT EVIDENCE TO SUPPORT THE CHARGES LEVIED AGAINST MR. CELLI (sic) IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶36} In his second assignment of error, Mr. Lewis alleges that he received ineffective assistance of counsel because his counsel failed to present a compelling Crim.R. 29(A) motion on his behalf at either the close of the State's case or the conclusion of trial. We disagree.

{¶37} To prove ineffective assistance of counsel, Mr. Lewis must establish that (1) his counsel's performance was deficient, and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate prejudice, he must prove that "there exists a reasonable probability that, were it not for counsel's [deficient performance], the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. This Court need not address both prongs of *Strickland* if Mr. Lewis fails to prove either one. *State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10.

{¶38} At the close of the State's case, defense counsel indicated that he was making a general motion for acquittal on all counts without argument, "unless the court somehow wants to entertain oral argument." Likewise, when renewing his motion for acquittal, defense counsel did not articulate any specific grounds for his motion. Mr. Lewis argues that his counsel's failure to articulate an argument on his behalf prejudiced him because the State failed to prove its case

beyond a reasonable doubt and, had his counsel argued more effectively, "there was a reasonable probability that the trial result would have been different * * *."

**{¶39}** Mr. Lewis has not shown that he was prejudiced due to his counsel's failure to articulate a more compelling motion for acquittal. First, "'a Crim.R. 29 motion is not necessary to preserve the issue of sufficiency for appeal.'" *State v. Litten*, 9th Dist. Summit Nos. 26812, 2014-Ohio-577, ¶ 43, quoting *State v. Good*, 9th Dist. Wayne Nos. 10CA0056 and 10CA0057, 2011-Ohio-5077, ¶ 26. Mr. Lewis was free to raise a sufficiency challenge on appeal, regardless of his counsel's alleged failure to articulate a more compelling motion for acquittal on his behalf. Second, the record does not support Mr. Lewis' contention that, had his counsel argued more persuasively, the result here might have been different. *See State v. Slater*, 9th Dist. Summit No. 28049, 2016-Ohio-7766, ¶ 12. A motion for acquittal requires the court to view the evidence in a light most favorable to the prosecution and ask whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. As noted above, the victim here specifically testified that Mr. Lewis took her against her will, repeatedly punched her, and kept her in his basement for over seven hours while she was suffering a painful and debilitating injury. "In viewing the above evidence in a light most favorable to the State, Mr. [Lewis'] Crim.R. 29 motion, no matter how persuasive, clearly would have been denied." *Slater* at ¶ 12. Thus, he cannot demonstrate prejudice as a result of his counsel's decision to make an abbreviated argument in support of his motion. Mr. Lewis' second assignment of error is overruled.

III.

**{¶40}** Mr. Lewis' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

CARR, P. J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

DAWN M. KING, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.