[Cite as *State v. Randleman*, 2019-Ohio-3221.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | | |

STATE OF OHIO

    Appellee

    v.

DEVONTAE RANDLEMAN

    Appellant

C.A. No.     17CA011179

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.     17CR095509

DECISION AND JOURNAL ENTRY

Dated: August 12, 2019

CALLAHAN, Judge.

{¶1} Defendant-Appellant, Devonte Randleman, appeals from his convictions in the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2} Someone shot S.D. four times after he came home in the middle of the night. The police discovered his body lying in his driveway along with a pair of sunglasses and an iPhone. Because his apartment had been ransacked, the police surmised that a burglary had been in progress when S.D. unexpectedly returned home. An anonymous tip led them to Mr. Randleman, and evidence found at the scene also pointed toward his involvement. Forensic testing of the sunglasses and iPhone detected Mr. Randleman's DNA on those items. Additionally, his DNA was detected on a loaded firearm the police found lying on a dresser inside S.D.'s apartment. The iPhone was registered to Mr. Randleman's girlfriend and used by Mr. Randleman. The police discovered that someone remotely wiped the phone and restored it

to its factory settings a little over two hours after the murder. They also discovered that, later that same day, Mr. Randleman purchased a new cell phone.

{¶3} A grand jury indicted Mr. Randleman on one count of aggravated murder; one count of murder; one count of felony murder; two counts of aggravated robbery, charged under alternative subsections; two counts of aggravated burglary, charged under alternative subsections; two counts of felonious assault, charged under alternative subsections; one count of tampering with evidence; one count of having a weapon under disability; and numerous firearm specifications. The matter proceeded to trial, and a jury found Mr. Randleman guilty on all counts. The trial court then sentenced him to a total of 33 years to life in prison.

{¶4} Mr. Randleman now appeals from his convictions and raises three assignments of error for review. For ease of analysis, this Court rearranges his assignments of error.

II.

### ASSIGNMENT OF ERROR NO. 2

THE STATE OF OHIO VIOLATED THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT, AND BATSON V. KENTUCKY, WHEN THE PROSECUTOR EXCUSED THE ONLY AFRICAN AMERICAN JUROR FOR BEING "DISHONEST" WHEN HE ONLY DISCLOSED A CRIMINAL CONVICTION THROUGH A JURY QUESTIONNAIRE AND NOT AFFIRMATIVELY DURING VOIR DIRE.

{¶5} In his second assignment of error, Mr. Randleman argues that his due process rights were violated when the trial court allowed the State to strike Juror Number 5, the only member of the jury pool who was an African American. Upon review, this Court rejects his argument.

{¶6} "The Equal Protection Clause of the United States Constitution prohibits deliberate discrimination based on race by a prosecutor in his exercise of peremptory challenges." *State v. Campbell*, 9th Dist. Summit No. 24668, 2010-Ohio-2573, ¶ 33, citing

*Batson v. Kentucky*, 476 U.S. 79, 89 (1986). "'A court adjudicates a *Batson* claim in three steps.'" *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, ¶ 61, quoting *State v. Murphy*, 91 Ohio St.3d 516, 528 (2001).

> In the first step, a defendant must make a prima facie showing that the [S]tate has exercised a peremptory challenge on the basis of race. Once the prima facie showing has been made, the State must offer a basis for striking the prospective juror that is race-neutral. Finally, the trial court must consider the parties' positions to determine whether the defendant has demonstrated purposeful discrimination.

(Internal citations omitted.) *State v. Jackson*, 9th Dist. Summit No. 27739, 2017-Ohio-278, ¶ 6. The final step directs the court to examine the State's race-neutral explanation "'in context to ensure [its] reason is not merely pretextual.'" *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, ¶ 63, quoting *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, ¶ 65. The court "must 'assess the plausibility' of the prosecutor's reason for striking the juror 'in light of all evidence with a bearing on it.'" *Pickens* at ¶ 63, quoting *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005). "The conclusion of the trial court that the [S]tate did not possess discriminatory intent in the exercise of its peremptory challenges will not be reversed on appeal absent a determination that it was clearly erroneous." *State v. Hernandez*, 63 Ohio St.3d 577, 583 (1992).

{¶7} During voir dire, the prosecutor asked the prospective jurors whether any of them, their family members, or their friends had ever been "accused or convicted of a crime." Two prospective jurors responded, and the prosecutor asked those jurors about their experiences and whether those experiences would affect their impartiality. The prosecutor then asked the jury pool: "Anyone else? Someone? Anyone else? Here? Anyone?" Because no one else responded, the prosecutor changed topics. Later during voir dire, however, a third prospective juror asked to return to the prosecutor's question and discuss the matter in private. After she did so, a fourth prospective juror likewise indicated that she wanted to discuss the matter in private.

Both prospective jurors were given the opportunity to answer the prosecutor's question in chambers.

{¶8}    At the conclusion of voir dire, the prosecutor sought to excuse Juror Number 5. Mr. Randleman objected on the basis that Juror Number 5 was the only prospective juror who was African American.  Because Juror Number 5 had not answered any questions in a manner that might lead someone to question his impartiality, Mr. Randleman argued that the State's peremptory challenge was race-based.  The prosecutor noted, however, that Juror Number 5 had failed to disclose his criminal convictions during voir dire.  The prosecutor knew that Juror Number 5 had been convicted of "making false alarms and falsification" because he had included that information on his jury questionnaire.  Yet, Juror Number 5 had not responded when the prosecutor asked whether anyone had ever been convicted of a crime.  Nor had he come forward when two other prospective jurors later indicated that they wished to discuss the prosecutor's question in chambers.  The prosecutor stated that she was striking Juror Number 5 because she felt he was not giving truthful answers.  She noted that she was striking another juror for the same reason, as that juror also had failed to disclose her prior conviction during voir dire.  After hearing from the prosecutor, the trial court overruled Mr. Randleman's objection.

{¶9}    Mr. Randleman concedes that the State provided a race-neutral reason for its decision to strike Juror Number 5. *See Jackson*, 2017-Ohio-278, at ¶ 6.  His argument is that the State's reason was a pretext for unlawful discrimination.  He claims that the State misled the court when it portrayed Juror Number 5 as dishonest.  He notes that Juror Number 5 answered his jury questionnaire honestly, and the prosecutor never directly inquired of him during voir dire.  Because the record supports the conclusion that the State engaged in purposeful discrimination, Mr. Randleman argues, the court's finding to the contrary is clearly erroneous.

{¶10} This Court cannot conclude that the trial court clearly erred when it found that the prosecutor lacked a discriminatory intent. *See Hernandez*, 63 Ohio St.3d at 583. A prospective juror's past criminal history, standing alone, "'""is a valid, race-neutral reason for raising a peremptory challenge."'"" *State v. Lewis*, 9th Dist. Summit No. 28064, 2017-Ohio-2747, ¶ 11, quoting *State v. Lacey*, 7th Dist. Mahoning No. 10MA122, 2012-Ohio-1685, ¶ 127, quoting *State v. Santiago*, 10th Dist. Franklin No. 02AP-1094, 2003-Ohio-2877, ¶ 10. Here, apart from the mere fact of Juror Number 5's prior conviction, the prosecutor explained that she struck him because she felt he had failed to answer her questions truthfully. *See State v. Moss*, 9th Dist. Summit No. 24511, 2009-Ohio-3866, ¶ 12 ("[A] peremptory challenge may be exercised for *any* racially-neutral reason."). Even if Juror Number 5 disclosed his prior conviction on his jury questionnaire, he failed to respond when asked about prior convictions during voir dire. He did not respond when the prosecutor first asked her question. He did not respond when two prospective jurors disclosed their family members' prior convictions. He did not respond when the prosecutor followed up on her inquiry (i.e., "Anyone else? Someone? Anyone else? Here? Anyone?"). Finally, he did not respond when two other prospective jurors later asked for an opportunity to answer the prosecutor's question in chambers. The prosecutor specifically cited Juror Number 5's failure to take advantage of any of the foregoing opportunities as a basis for her conclusion that he was not being truthful. Moreover, she indicated that she had struck another prospective juror for the same reason. Contrary to Mr. Randleman's argument, "[t]here is no indication in the record that the State possessed a discriminatory intent when it sought to remove Juror Number [5] from the venire." *Lewis* at ¶ 11. Accordingly, this Court cannot conclude that the trial court clearly erred when it overruled Mr. Randleman's *Batson* challenge. *See Hernandez* at 583.

{¶11} Mr. Randleman's brief also contains a singular assertion that the trial court erred by rejecting his *Batson* challenge without first conducting "a proper *Batson* hearing under *Hicks v. Westinghouse [Materials Co.]*, [78 Ohio St.3d 95 (1997)]." The record reflects, however, that Mr. Randleman failed to raise this argument in the lower court. *See State v. Rice*, 9th Dist. Medina No. 08CA0054-M, 2009-Ohio-5419, ¶ 9 ("When reviewing arguments on appeal, this Court cannot consider issues that are raised for the first time on appeal."). The trial court listened to the parties' arguments and made its *Batson* ruling at sidebar. Mr. Randleman never requested a more extensive hearing. Nor has he claimed that the trial court misapplied the standard articulated in *Batson*. *Compare Hicks* at 98-99. Because Mr. Randleman has not shown that the trial court erred by overruling his *Batson* challenge, this Court rejects his arguments to the contrary. Mr. Randleman's second assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 3

THE EVIDENCE IN THIS MATTER WAS INSUFFICIENT TO CONVICT [MR.] RANDLEMAN OF AGGRAVATED MURDER OR MURDER BY CAUSING THE "PURPOSEFUL" DEATH OF THE VICTIM WHILE COMMITTING A BURGLARY OR ROBBERY. THE EVIDENCE PRESENTED WAS ONLY SUFFICIENT TO DEMONSTRATE THAT A MURDER OCCURRED. THE EVIDENCE FAILED TO SHOW A PURPOSEFUL KILLING, BUT ONLY A DEATH CAUSED AS THE PROXIMATE RESULT OF COMMITTING A BURGLARY.

{¶12} In his third assignment of error, Mr. Randleman argues that his aggravated murder and murder convictions are based on insufficient evidence. Specifically, he argues that there was no evidence he purposely caused S.D.'s death. This Court disagrees.

{¶13} "Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo." *State v. Williams*, 9th Dist. Summit No. 24731, 2009-Ohio-6955, ¶ 18, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether the prosecution has met its burden of production by presenting sufficient evidence to

sustain a conviction. *Thompkins* at 390 (Cook, J., concurring). In reviewing the evidence, we do not evaluate credibility, and we make all reasonable inferences in favor of the State. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). The evidence is sufficient if it allows the trier of fact to reasonably conclude that the essential elements of the crime were proven beyond a reasonable doubt. *Id.*

{¶14} A person commits murder if he "purposely cause[s] the death of another * * *." R.C. 2903.02(A). The crime constitutes aggravated murder if he purposely causes the other's death "while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery * * * [or] aggravated burglary * * *." R.C. 2903.01(B). "A person acts purposely when it is [his] specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is [his] specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶15} "A person need not be the principal offender to be convicted of a crime." *State v. Davis*, 9th Dist. Summit No. 26660, 2013-Ohio-5226, ¶ 11. R.C. 2923.03(A)(2) prohibits any person, "acting with the kind of culpability required for the commission of an offense, [from] * * * [a]id[ing] or abet[ting] another in committing the offense." "To support a conviction for complicity by aiding and abetting * * *, the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. "'[A] jury can infer an aider and abettor's purpose to kill where the facts show that the participants in a felony entered into a common design and either the aider or abettor knew that an inherently dangerous instrumentality was to be employed to accomplish

the felony or the felony and the manner of its accomplishment would be reasonably likely to produce death.'" *State v. Lollis*, 9th Dist. Summit No. 26607, 2014-Ohio-684, ¶ 21, quoting *State v. Scott*, 61 Ohio St.2d 155, 165 (1980). "A person who violates R.C. 2923.03(A)(2) is guilty of complicity and 'shall be prosecuted and punished as if he were a principal offender.'" *Davis* at ¶ 11, quoting R.C. 2923.03(F).

{¶16} The State set forth evidence that S.D. was shot and killed in his driveway around 4:00 a.m. on August 5, 2016. He was shot four times with a .40 caliber firearm, but that firearm was never recovered. The police officers who responded to the scene found S.D.'s garage door open and his apartment ransacked. Items had been strewn about, cabinet doors and dresser drawers had been left open, and the toilet tank cover had been removed. Inside the apartment, the police observed several items of interest, including (1) drug paraphernalia; (2) packaging consistent with the type used to transport powdered drugs; and (3) a loaded firearm lying on top of a dresser in the spare bedroom. Outside the apartment, they also found several items of interest, including (1) a small blowtorch and hammer, both of which had been used to disable the front door; (2) a pair of sunglasses; (3) an iPhone; and (4) a drawstring bag containing money, several champagne canisters, and two firearms that were later traced to S.D. Both the sunglasses and the iPhone were discovered lying on the driveway just outside S.D.'s garage.

{¶17} The police were able to trace three of the items they found at S.D.'s apartment to Mr. Randleman. First, his DNA was detected on the loaded firearm they found lying on top of the dresser in S.D.'s spare bedroom. Second, his DNA was detected on the sunglasses they found lying on the driveway just outside the garage. Third, his DNA was detected on the iPhone they found lying in the same area.

{¶18} Several witnesses testified about the iPhone. A records custodian from Sprint linked the iPhone to a prepaid account registered to D.C., Mr. Randleman's girlfriend. The prepaid account reflected that D.C. had activated two devices over the course of her subscription. Service for the first device was activated in June 2016 and remained active until August 5, 2016. On that date, service was transferred to the second device. The State produced evidence that D.C. and Mr. Randleman went to Best Buy on the afternoon of August 5th to purchase the second device. Though neither phone was registered in Mr. Randleman's name, the State produced evidence that he was the user of both phones.

{¶19} The police were only able to obtain limited information from the iPhone. A cybercrimes agent from the Bureau of Criminal Investigation inspected the phone and determined that it had been restored to its factory settings as a result of being remotely wiped through Apple. The only information he was able to retrieve from the phone was a file creation date and a file termination date. The file creation date showed that the files on the phone had been created in June 2016. The file termination date showed that the files had been terminated at 6:10 a.m. on August 5, 2016; a little over two hours after the murder. D.C. testified that she had used Mr. Randleman's Apple ID to remotely wipe the phone after she spoke with him at 5:50 a.m. on August 5th. She claimed that she did so because Mr. Randleman said he had lost the phone and it contained potentially embarrassing pictures and videos of her.

{¶20} Both Mr. Randleman and D.C. told the police that Mr. Randleman was in Sandusky at the time of the murder. D.C. initially claimed to have driven Mr. Randleman there herself, but later recanted. The call history records that Sprint maintained for the iPhone demonstrated that the phone was still in the Lorain area at 12:36 a.m. on August 5th. Thereafter, no calls were made or received on the phone until 4:32 a.m. At that time, the phone began

receiving calls. It is undisputed that the police arrived at S.D.'s apartment shortly after 4:30 a.m., by which point in time the phone was already lying in his driveway.

{¶21} Special Agent Jonathan Lieber acted as the lead investigator in this matter. Given that S.D. had been earning a significant amount of money as a drug dealer, Special Agent Lieber believed that more than one person had broken into his apartment to steal his money and his product. The special agent theorized that one of the intruders had brought sunglasses with him to protect his eyes as he used a blowtorch to destroy the door lock on the apartment. He further theorized that the burglary was still in progress when S.D. unexpectedly arrived home and "spooked" the intruders, at which point an altercation took place in the driveway. Special Agent Lieber speculated that one of the intruders dropped several of his items in the driveway and either he or his accomplice also dropped a drawstring bag while running from the scene. He noted that the drawstring bag was awkward and heavy because, apart from being loaded with two firearms and several other items, it contained more than 17 pounds of loose change. Special Agent Lieber theorized that the intruders panicked and ran quickly once they shot S.D. because the gunshots would have been noteworthy at that time of night in a relatively quiet community.

{¶22} Mr. Randleman argues that his aggravated murder and murder convictions are based on insufficient evidence because the State failed to prove that he burglarized S.D.'s home with the intention of killing him. He argues that, at best, the evidence showed it was his accomplice who shot S.D. Further, he argues that the evidence showed the killing was a spontaneous event, not a planned occurrence. Because there was no evidence that he specifically intended to kill S.D., Mr. Randleman argues, the State failed to prove mens rea on his aggravated murder and murder charges.

{¶23} Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State proved mens rea beyond a reasonable doubt. *See Jenks*, 61 Ohio St.3d at 273. The State set forth evidence that Mr. Randleman was present both before and during S.D.'s murder, as his sunglasses, iPhone, and gun were found at the scene. *See State v. Smith*, 9th Dist. Summit No. 25650, 2012-Ohio-794, ¶ 7, quoting *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, ¶ 13 ("The criminal intent of [an] aider and abettor 'can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed.'"). Even if it was his accomplice who ultimately shot S.D. with a .40 caliber gun, the record supports the conclusion that Mr. Randleman brought his own gun to the scene. S.D. was a known drug dealer, so the jury reasonably could have inferred that Mr. Randleman recognized the potential dangers involved in the burglary and armed himself accordingly. Because he and his accomplice broke into S.D.'s apartment in the middle of the night, fully armed, to commit a theft offense, the jury reasonably could have inferred that he "'entered into a common design'" knowing either that (1) "'an inherently dangerous instrumentality was to be employed to accomplish the felony'"; or (2) "'the felony and the manner of its accomplishment would be reasonably likely to produce death.'" *Lollis*, 2014-Ohio-684, at ¶ 21, quoting *Scott*, 61 Ohio St.2d at 165. Upon review, Mr. Randleman has not shown that his aggravated murder and murder convictions are based on insufficient evidence. Accordingly, his third assignment of error is overruled.

**ASSIGNMENT OF ERROR NO. 1**

THE COURT COMMITTED PLAIN ERROR WHEN IT UTILIZED THE DEFINITION OF "CAUSE" AS AN ACT WHICH, IN A NATURAL AND CONTINUOUS SEQUENCE, DIRECTLY PRODUCES THE DEATH OF A PERSON. THIS IS AN INCORRECT STATEMENT OF LAW UNDER OHIO JURY INSTRUCTIONS AND THE OHIO STATE SUPREME COURT.

{¶24} In his first assignment of error, Mr. Randleman argues that the trial court committed plain error when it instructed the jury on aggravated murder. Specifically, he argues that he was prejudiced by the court's instruction on the element of causation. Because Mr. Randleman has not shown that the trial court committed plain error, this Court rejects his argument.

{¶25} A defendant's "[f]ailure to object to a jury instruction limits review of the alleged error to the plain error standard." *State v. Fry*, 9th Dist. Medina No. 16CA0057-M, 2017-Ohio-9077, ¶ 20. Plain error exists only where there is a deviation from a legal rule, that is obvious, and that affected the appellant's substantial rights to the extent that it affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. Further, "[w]hen reviewing jury instructions, the appellate court reviews the instructions as a whole." *State v. Schell*, 9th Dist. Summit No. 28255, 2017-Ohio-2641, ¶ 38. "'[M]isstatements and ambiguity in a portion of the instructions will not constitute reversible error unless the instructions are so misleading that they prejudicially affect a substantial right of the complaining party.'" *State v. Horne*, 9th Dist. Summit No. 24672, 2010-Ohio-350, ¶ 19, quoting *Wozniak v. Wozniak*, 90 Ohio App.3d 400, 410 (9th Dist.1993).

{¶26} When instructing the jury on the elements of aggravated murder, the trial court defined "cause" as follows:

"Cause" is an act which, in a natural and continuous sequence, directly produces the death of a person and without which the death could not have occurred.

The court used the same definition when instructing the jury on the elements of murder and felony murder. Mr. Randleman argues that the court's causation instruction was misleading as to

his aggravated murder charge because it included a foreseeability component. He avers that the instruction's "natural and continuous sequence" language allowed the jury to convict him of aggravated murder in the absence of a finding of specific intent. Because the instruction relieved the State of its burden to prove mens rea, Mr. Randleman argues, he was denied a fair trial.

{¶27} For purposes of criminal trials, the Ohio Jury Instructions offer a standard causation instruction:

> 1. CAUSE. * * * Cause is an act or failure to act which in a natural and continuous sequence directly produces the [death of another], and without which it would not have occurred.

> 2. NATURAL CONSEQUENCES. The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act or failure to act. The defendant is also responsible for the natural and foreseeable [consequences] that follow, in the ordinary course of events, from the act or failure to act.

*Ohio Jury Instructions*, CR Section 417.23 (2019). For an aggravated murder charge, however, the Ohio Jury Instructions offer a specific causation instruction:

> 4. CAUSATION. * * * Cause is an act which directly produces the [death of another], and without which it would not have occurred.

*Ohio Jury Instructions*, CR Section 503.01 (2019). Unlike the standard instruction, the aggravated murder instruction omits any reference to the "natural and foreseeable consequences" of one's act. *Compare* Ohio Jury Instructions, CR Section 417.23 *with* Ohio Jury Instructions, CR Section 503.01.

{¶28} The Ohio Supreme Court has repeatedly "expressed concern that the standard foreseeability instruction may be confusing in aggravated murder cases." *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, ¶ 105. *Accord State v. Getsy*, 84 Ohio St.3d 180, 196 (1998); *Causation Comment to Ohio Jury Instructions*, CR 503.01. Yet, it also has recognized that "[t]he use of that instruction * * * does not require reversal where the instructions as a whole make clear that the jury must find purpose to kill in order to convict." *State v. Phillips*, 74 Ohio

St.3d 72, 100 (1995). The question is whether the instructions adequately conveyed that "the jury was required to find specific intent to kill and prior calculation and design before it could convict [the defendant] of aggravated murder." *State v. Jalowiec*, 91 Ohio St.3d 220, 231 (2001). *Accord State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 99.

{¶29} Upon review, Mr. Randleman has not shown that the trial court committed plain error when it instructed the jury on his aggravated murder charge. The trial court instructed the jury that it could find Mr. Randleman guilty of aggravated murder only if it found that he purposely caused S.D.'s death during the commission or attempted commission of an aggravated robbery or aggravated burglary. The court then "extensively instructed the jury on the requirement of purpose and intent prior to the causation language." *State v. Goodwin*, 84 Ohio St.3d 331, 346 (1999). It instructed the jury (1) that it must have been Mr. Randleman's "specific intention to purposely cause the death of another"; (2) that he must have "act[ed] with a conscious objective of producing a specific result"; and (3) that his actions must not have been accidental. It also instructed the jury that "[p]urpose and intent mean the same thing" and that purpose may be inferred from the fact that a victim's wound is inflicted "with a deadly weapon in a manner calculated to destroy life * * *." Moreover, the court specifically instructed the jury that "no person may be convicted of aggravated murder unless he or she specifically intended to cause the death of another." "[W]hen viewed in the requisite full context, the trial court's instructions adequately conveyed to the jury that it could not convict [Mr. Randleman] of aggravated murder unless it found specific intent to kill." *Gross* at ¶ 99. *See Williams* at ¶ 105; *Jalowiec* at 231.

{¶30} In rejecting Mr. Randleman's argument, this Court neither adopts, nor approves of the trial court's decision to use one causation instruction for all three of Mr. Randleman's murder

charges. This Court would caution the trial court against including "natural and continuance sequence" language in its causation instruction for aggravated murder. *See Getsy* at 196. In this instance, however, this Court cannot conclude that the trial court's inclusion of that language resulted in plain error. That is because the instructions, as a whole, made it clear that the jury could only convict Mr. Randleman of aggravated murder upon a finding of specific intent to kill. *See Williams* at ¶ 105; *Gross* at ¶ 99; *Jalowiec* at 231. For that reason, Mr. Randleman's first assignment of error is overruled.

### III.

**{¶31}** Mr. Randleman's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

––––––

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

TEODOSIO, P. J.
HENSAL, J.
CONCUR.

APPEARANCES:

JOHN D. TOTH, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and LINDSEY C. POPROCKI, Assistant Prosecuting Attorney, for Appellee.