[Cite as *State v. Clark*, 2024-Ohio-3186.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,           :

                                        Nos. 112886 and 112888

    v.                             :

ANTONIO L. CLARK,                       :

    Defendant-Appellant.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 22, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case Nos. CR-22-670403-A and CR-22-671900-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Owen Knapp, Assistant Prosecuting Attorney, *for appellee*.

Law Office of Timothy Farrell Sweeney and Timothy F. Sweeney, *for appellant*.

LISA B. FORBES, J.:

{¶ 1} Defendant-appellant, Antonio L. Clark ("Clark"), appeals his two convictions for burglary following a combined jury trial in three cases. Finding no reversible error on the issues raised, we affirm.

## I. Factual and Procedural Background

{¶ 2} In 2022, Clark was indicted in three cases for the crimes allegedly committed in 2016. In CR-22-670403-A, he was charged with one count of burglary, a second-degree felony in violation of R.C. 2911.12(A)(2), and one count of theft, a fifth-degree felony in violation of R.C. 2913.02(A)(1). These charges stemmed from the burglary of Victim No. 1's home. In CR-22-671900-he was indicted with the same two charges related to the burglary of Victim No. 2's home. Clark was again indicted with the same two charges in a third case, CR-22-670402-A, related to the burglary of Victim No. 3's home.

{¶ 3} All three cases were consolidated for trial over Clark's objection. A multiday trial commenced on May 2, 2023, where the following testimony and evidence was adduced.

{¶ 4} Victim No. 1 testified that he left his home around 1:00 p.m. on September 27, 2016, to run some errands. He returned around 5:00 p.m. to discover a window was broken out and the house had been ransacked. Victim No. 1 described the items taken from his home, which included a safe, $3,750 in cash, a backpack, and an iPad. He also testified he replaced the window at a cost of $350.

{¶ 5} Victim No. 2 testified that on October 16, 2016, she returned home after spending the night elsewhere to find her garage door open and her two cats outside. On entering her home, she discovered that it was ransacked, things were missing, and a window in the rear of the house had been broken out. She inventoried the items missing from her home: a bike she valued at $700, a computer valued at

$1800, a television, and costume jewelry. She testified that the window cost $2,000 to replace.

{¶ 6} Victim No. 3 testified that she came home from a two-week vacation on September 9, 2016, and found that her home had been ransacked. She discovered that bottles of alcohol, jewelry, electronics, and car keys were taken. She also observed that a window air conditioning unit was removed from a window and was found on the living room floor. She valued her missing property at approximately $10,000.

{¶ 7} In each case, the victims called the police after discovering their homes had been broken into. Cleveland police officers responded to each scene and crime scene unit investigators responded to collect evidence. In each case, fingerprints were obtained from various items and surfaces.

{¶ 8} Carla Crowell testified that she was a crime scene investigator in 2016 employed by the Cleveland Police Department and she responded to Victim No. 1's house on a report of a burglary on September 28, 2016. She gathered some fingerprints from the home while investigating the scene of the burglary. She also took photographs of the home. She obtained fingerprints from a watch box, a flower vase, and a file cabinet.

{¶ 9} Cesar Herrera, a crime scene investigator employed by the Cleveland Police Department in 2016, testified that he responded to Victim No. 2's home on October 11, 2016. He collected fingerprints from the home, including from a rear

window, a bottle of vodka in the kitchen, and a vacuum cleaner handle in the upstairs bedroom.

{¶ 10} Jonathan Riedthaler, who testified he was a crime scene investigator employed by the Cleveland Police Department in 2016, responded to the reported burglary at Victim No. 3's home. He recovered fingerprints from a window air conditioner that was pulled out a window, as well as from a box that Victim No. 3 reported had been moved.

{¶ 11} In 2016, Cleveland Police were not able to locate any suspects. Then, in 2022, Cleveland police were notified of a possible fingerprint match from a fingerprint database. Dymphna O'Neill, a detective with the Cleveland Police Department, was assigned the case after possible fingerprint matches were found. She contacted Victim No. 1 and Victim No. 3 and established that the victims did not know appellant.

{¶ 12} Mawanda Berry-Wheatley testified that she was employed by Cleveland Police Department as a latent fingerprint examiner. She examined several fingerprint samples taken from the three victim's homes. She compared them to prints taken from appellant on May 2, 2022. She reviewed prints taken from Victim No. 2's home, including from a bottle of vodka in the kitchen, an exterior rear window, and a vacuum handle. She also reviewed prints obtained from Victim No. 1's home from a glass vase, a watch box, and a file drawer. She also reviewed fingerprints taken from Victim No. 3's home from a displaced box, an AC

unit, and a window. She testified that fingerprints obtained from each of the crime scenes matched the known prints taken from appellant.

{¶ 13} At the conclusion of trial, in CR-22-670403-A related to Victim No. 1, Clark was found guilty of burglary, and the jury was unable to reach a verdict on the single count of theft. The State decided not to pursue the charge of theft, which was ultimately dismissed with prejudice prior to sentencing. In CR-22-671900-A related to Victim No. 2, Clark was found guilty of burglary and not guilty of theft. The jury found Clark not guilty of the charges related to the burglary of Victim No. 3's home in CR-22-670402-A. The cases proceeded to sentencing where the court imposed a four-year prison term on each count of burglary and ordered them to be served concurrent to each other.

{¶ 14} Clark then filed the instant appeals related to his conviction for burglary in CR-22-670403-A and his conviction for burglary in CR-22-671900-A. These appeals were consolidated for briefing, hearing, and disposition by this court.

{¶ 15} Clark raises the following assignments of error for our review:

I. The prosecutor's use of a peremptory challenge to excuse one of the only two Black jurors on the prospective jury panel, without the court addressing whether the prosecutor's proffered reason was a pretext for racial discrimination, denied Clark, who is also Black, his constitutional right to equal protection.

II. Clark's convictions for burglary are against the manifest weight of the evidence.

## II. Law and Analysis

### A. The Removal of a Juror Allegedly Base on Racial Motivations

{¶ 16} The United States Supreme Court has established that a prosecutor's racially motivated use of a peremptory challenge violates the Equal Protection Clause of the Fourteenth Amendment. *State v. Gowdy*, 88 Ohio St.3d 387, 392 (2000), citing *Batson v. Kentucky*, 476 U.S. 79 (1986). In his brief, Clark argues that Juror No. 6 was only one of two Black members of the venire and the State's use of a peremptory challenge to remove Juror No. 6 violated constitutional rights as set forth in *Batson*.

{¶ 17} *Batson* instructs courts to apply a three-step process for determining whether a peremptory challenge is race-based. In the first step, the one questioning the use of a peremptory challenge must establish a prima facie showing of racial discrimination. *State v. Garrett*, 2022-Ohio-4218, ¶ 68. "The opponent of a peremptory challenge must show that the peremptory challenge was used to remove from the venire a member of a cognizable racial group and that the facts and circumstances raise an inference that the use of the peremptory challenge was racially motivated." *State v. Nicholson*, 2022-Ohio-2037, ¶ 97 (8th Dist.), citing *State v. Johnson*, 88 Ohio St.3d 95, 116 (2000), citing *State v. Hill*, 73 Ohio St.3d 433, 444-445 (1995).

{¶ 18} Then, the burden shifts to the State to provide an explanation for its use of the peremptory challenge that is not based on race. *Id.* The trial court reviews this race-neutral explanation and determines whether it is facially valid. The race-

neutral reason offered by the State does not need to rise to the level of excusing a juror for cause. *Garrett* at ¶ 68, citing *Hernandez v. New York*, 500 U.S. 352, 360 (1991).

{¶ 19} In the third step, "the court must decide whether the neutral explanation offered by the proponent of the strike is credible or instead is a 'pretext' for unconstitutional discrimination." *Gowdy*, 88 Ohio St.3d 387, 393 (2000), citing *Hernandez* at 363. The trial judge considers the reasons offered by the State in light of all the relevant circumstances. *Flowers v. Mississippi*, 588 U.S. 284, 302 (2019). *See also Nicholson* at ¶ 99 ("[T]he court must examine the State's peremptory challenges in context to determine whether the prosecutor's stated reasons were the actual reasons or were, instead, merely a pretext for discrimination.").

{¶ 20} Appellate review of the trial court's decision is deferential because the trial judge is in the best position to assess the credibility and demeanor of jurors and the State in offering its race-neutral reasons. *Flowers* at 303. "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson*, 476 U. S. at 98. The trial court's decision will not be disturbed on appeal unless it is found to be clearly erroneous. *State v. Thompson*, 2014-Ohio-4751, ¶ 53, citing *State v. Bryan*, 2004-Ohio-971, ¶ 106.

{¶ 21} During the court's voir dire of the venire, the judge asked whether anyone had a family member or close friend who was charged with or convicted of a crime. Juror Nos. 3, 5, and 6 answered that they had. Juror Nos. 3 and 5 indicated

that these convictions were four and three years ago, respectively.  Juror No. 5 stated that the person was treated fairly.  When the trial judge questioned Juror No. 6, he stated that the previous month his nephew was convicted of murder and Juror No. 6 became visibly upset.  Juror No. 6 stated he did not expect to start crying.  The court inquired further:

> The Court:  Anything about that case that would cause you issues sitting on this case?
>
> Juror No. 6:  No.  Just thinking about my nephew.
>
> The Court:  Do you think you could be fair to the State and Defense?
>
> Juror No. 6:  Yea, I can.
>
> The Court:  And it was the Cuyahoga County Prosecutor's Office who prosecuted your nephew?
>
> Juror No. 6:  I'm sure, because it was in this building.
>
> The Court:  Okay.  On behalf of the State.

{¶ 22} The parties then questioned Juror No. 6:

> The State:  Seems like you've been on both sides of this as a victim and someone close to you as a Defendant.  Do you feel since this is so recent, your nephew just being one month ago, do you think that that will be on your mind when you see the Defendant, thinking of your nephew?
>
> Juror No. 6:  Probably.  I can try and get through it, but I probably will, because like I said, I wasn't expecting that to happen just now [referring to crying].
>
> The State:  Do you feel you will have sympathy for the Defendant because of your nephew and his situation?
>
> Juror No. 6:  Well, I can't answer that.  I don't know.
>
> The State:  Okay.  Thank you.

The Court: Okay. [Defense counsel].

Defense Counsel: I'm sorry for what's happened. Thank you for being honest. No questions.

{¶ 23} Later, the State sought to remove Juror No. 6 for cause. The following arguments occurred:

The State: When we were speaking with him up here, I asked him if he would be thinking of his nephew because his nephew was just convicted of murder about a month ago.

He said he would be thinking about his nephew. I asked him if he would be able to be fair and impartial and set that aside, and he said he wasn't sure and that he didn't expect to get emotional about that, so he wasn't sure.

Defense Counsel: I don't think he indicated that he could not be fair and impartial. I thought you were going to ask him more questions, but he never indicated that he could not be fair and impartial. So I would strongly object to his removal.

The State: Your Honor, I would just say he specifically said he wasn't sure, and he did indicate, when you're looking at Mr. Clark, are you going to be thinking of your nephew and that case, because it was only a month ago, and he said, I think so.

So if he's looking at the Defendant and thinking about a close relative, he's going to be sympathetic and take that situation into consideration here.

The Court: But I thought we brought him up here and I asked him if he could be fair and impartial he said he thought he could but that he was — I got the impression from asking him that he was somewhat caught off-guard of just being in the courtroom, and he said, I didn't expect to get emotional, but he seemed to calm down once we were at sidebar talking about it, and he said the incident with his nephew just recently happened, but he did not participate in the trial, and he did not go to the trial.

I thought I asked him if he could be fair and impartial, and he's like, he thought he could. He didn't know, but he thought he could.

Defense Counsel: That's what he said.

The Court: I will indicate that he is African American, as well. Our Defendant is African American, and I don't believe that rises to the level of for cause to remove him.

{¶ 24} After the trial court did not remove Juror No. 6 for cause, the State exercised its first peremptory challenge to remove Juror No. 6. At a sidebar, Clark's attorney argued that, pursuant to *Batson*, he was challenging the State's removal of Juror No. 6 because Juror No. 6 was one of only two African American jurors in the venire. The parties and the court discussed the challenge, and the State offered its reasons for the removal. After hearing arguments, the judge adjourned court for the day to allow the parties time to further research and argue the issue. On resuming court, the State succinctly stated its reason for seeking the removal of the juror:

> As I said, I think, multiple times on the record, the State did provide multiple race-neutral reasons for trying to excuse Juror Number 6.
>
> First, immediately when asked whether or not he knew anyone convicted of a crime, he started crying. We approached at sidebar. He disclosed that his nephew had been convicted of murder last month in this courthouse by our office, the Cuyahoga County Prosecutor's Office.
>
> He also disclosed, after I asked him if he would be — when he was in the courtroom, if he would be looking at the Defendant and thinking of his nephew and him being in that situation, he said, yes, I would, I would have to say that I would.
>
> Then I asked him, would you be more sympathetic towards the Defendant because of the situation with your nephew? And he said, I'm not sure. I can't answer that. I didn't expect to get this emotional, so I'm not sure.

Your Honor, as we said in voir dire, and as everyone knows, you're not to consider sympathy or punishment in deliberations, and that is the reason that the State of Ohio was trying to excuse that juror, because of that. We think he would be biased against the State of Ohio, whether he realizes it or not, or potentially biased, and that is why we were trying to use a peremptory challenge on him.

. . .

I questioned that juror the same way that I did every other juror. I followed up with every juror who said that they knew someone who was convicted of a crime. I asked them all the same questions. He was the only one that seemed to be emotionally affected by it, and I would have removed any other juror who responded in that same way, Your Honor.

{¶ 25} The trial court then set forth a lengthy analysis of the issue from the bench. The court accepted that the State presented a race-neutral reason, and the trial court stated its reasons for its decision with citations to case law and statements made by Juror No. 6 during voir dire. The court then went on to analyze whether the State's reasons were pretextual:

A prior criminal conviction of the prospective juror or a family member of a prospective juror can serve as a valid, race-neutral reason to remove a juror even if the conviction is not recent. Removing a juror based on a past criminal history of his or her family member is a valid race-neutral reason for raising a peremptory challenge.

. . .

So I believe, in this situation, that the State has provided a race-neutral reason, and that the Defendant's constitutional rights are not violated in excusing this juror, so I will permit him to be excused.

I would also like to put on the record, as well, in looking at a case, [*State v. Nicholson*, 2022-Ohio-2037], and in this case, Eighth District cited to a United States Supreme Court case, *Flowers*, [588 U.S. 284].

Comparing prospective jurors who were struck and not struck can be an important step in determining whether a *Batson* violation occurred

and can suggest that the Prosecutor's proffered explanations for striking black prospective jurors were a pretext for discrimination.

But here, the record does not support that at this time.

{¶ 26} As the trial court recognized, this court has held that "'[c]oncern that a juror cannot act fairly and impartially is an appropriate race-neutral reason to seek removal of a juror.'" *State v. Lee*, 2020-Ohio-6738, ¶ 25 (8th Dist.), quoting *State v. Blackshear*, 2020-Ohio-3187, ¶ 25 (8th Dist.), citing *State v. Webster*, 2016-Ohio-2624, ¶ 72 (8th Dist.). The trial court also correctly recognized that the criminal history of family members of a juror can serve as a valid reason to exercise a peremptory challenge. *State v. May*, 2015-Ohio-4275, ¶ 51 (8th Dist.) collecting cases. *See also State v. Garrett*, 2022-Ohio-4218, ¶ 84.

{¶ 27} Clark argues that the State did not meet its burden of providing a legitimate, race-neutral explanation for the removal of Juror No. 6. He claims that even though the juror could not answer the State's question about feeling sympathy for the defendant in light of Juror No. 6's nephew being recently convicted of murder and Juror No. 6 becoming visibly upset when just thinking about it, that Juror No. 6 did not express that he had any biases. He goes on to assert that there is no indication that Juror No. 6 had any bias against the State that is relevant to the case. Clark's argument ignores that Juror No. 6 became visibly upset when he informed the court that his nephew had been convicted of murder; he was unable to say whether he would have sympathy for Clark in light of this nephew and his nephew's

situation; and he was aware that his nephew was prosecuted by the same prosecutor's office bringing the instant charges against Clark.

{¶ 28} While we acknowledge that Juror No. 6 stated that he could be fair to both the State and defense, Juror No. 6 admitted that he would be thinking about his nephew during the trial and could not answer whether he would feel sympathy for Clark as a result. Once a juror voices a potential inability to act fairly and impartially, a later retraction of those statements may not sufficiently alleviate the concerns a party may have; the statements made by the juror can form the basis of a race-neutral reason to seek removal. *Blackshear* at ¶ 25. Under these circumstances, we do not find that the trial court was clearly erroneous when it found that the State had presented a race-neutral reason to excuse Juror No. 6.

{¶ 29} Clark further argues that even if the State established a race-neutral reason, the court erred by not properly engaging in the third part of the *Batson* analysis. Clark asserts that the State's purported reason is a classic example of pretext, disproportionately impacts African American potential jurors and defendants, and the State inconsistently used its peremptory challenges.

{¶ 30} In the third prong of the analysis, the challenger of the use of the peremptory bears the burden of persuasion. Clark failed to carry that burden below or here. The trial court accepted the State's reasons for excusing the juror as neutral. The trial court then went on to engage in the third prong of the analysis and examined whether the reasons were pretextual. The court found that they were not. We disagree with Clark's assertion that the reasons given by the State were not

relevant to the particular juror in this case. And while the statistics provided by Clark in his brief may indicate that criminal history of a close relative may disproportionately impact minority jurors that does not establish that the State's reasons were pretextual in this case. As explained above, the reasons offered by the State were supported by the record in this case and jurisprudence from this court and others. Accordingly, the trial court did not err by denying Clark's *Batson* challenge.

{¶ 31} For the first time on appeal, Clark also argues that the State's use of its peremptory challenge was inconsistent with its treatment of Juror No. 16. Clark asserts that Juror No. 16, who also had a nephew who was convicted of a crime, was not removed for cause. In his appellate brief, Clark did not reference anywhere in the record where this argument was made to the trial court. This is likely because Juror No. 16 was asked to replace Juror No. 9 after Juror No. 6 was removed and the *Batson* challenge was resolved by the judge.

{¶ 32} Generally, appellate courts do not address arguments made for the first time one appeal. *Fahey Banking Co. v. Carpenter*, 2019-Ohio-679, ¶ 15 (10th Dist.); *State v. Randleman*, 2019-Ohio-3221, ¶ 11 (9th Dist.) (rejecting an argument that the trial court did not hold a proper *Batson* hearing because it was raised for the first time on appeal). Even if the argument had been made to the trial court, there is no substantial evidence of disparate treatment between the State's use of its peremptory challenges in this case.

{¶ 33} "Comparing prospective jurors who were struck and not struck can be an important step in determining whether a *Batson* violation occurred." *Flowers*, 588 U.S. at 311 (2019), citing *Snyder v. Louisiana*, 552 U. S. 472, 483-484 (2008); *Miller-El II v. Dretke,* 545 U. S. 231, 241 (2005). The trial judge addressed this when deciding the *Batson* issue and found that the record did not support a finding of disparate treatment between the jurors and the State's use of peremptory challenges. We agree with the trial court's determination even in light of the new argument advanced in this appeal addressing the disparate treatment alleged between Juror Nos. 16 and 6.

{¶ 34} In comparing why the State may have used a peremptory challenge to excuse Juror No. 6 and why it did not excuse Juror No. 16, we find that the answers Juror No. 16 and Juror No. 6 provided to similar questions were vastly different. When Juror No. 16 was asked if she ever had a close friend or family member charged with or convicted of a crime, Juror No. 16 responded that her nephew was convicted of a drug-related crime ten years ago. Juror No. 6's nephew was convicted of murder the previous month. Juror No. 16 did not begin to cry when addressing this question. When the State asked Juror No. 16 if there was anything about that case that would influence her ability to be fair and impartial to the State, Juror No. 16 answered, "No." While Juror No. 6 answered that question similarly, Juror No. 6 also stated that he did not know if the conviction of his nephew would lead him to have sympathies for the defendant. His response to this question raised concern in the mind of the State about this juror's impartiality, and the trial court

found that explanation plausible and not pretextual. These two prospective jurors were not so similar that the State's race-neutral reason for excusing Juror No. 6 can be seen as pretextual.

{¶ 35} This court does not find that the trial court's decision is clearly erroneous. The trial court did not err in overruling Clark's *Batson* challenge and excusing Juror No. 6. Clark's first assignment of error is overruled.

## B. Manifest Weight

{¶ 36} Clark challenges his convictions for burglary, claiming the jury lost its way in because his convictions are not supported by the manifest weight of the evidence.

{¶ 37} A manifest-weight-of-the-evidence challenge "addresses the evidence's effect of inducing belief . . . . In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 2007-Ohio-2202, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997). Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 38} Clark was convicted of two counts of burglary as defined by R.C. 2911.12(A)(2). This statute prohibits a person "by force, stealth, or deception"

from trespassing "in the occupied structure or in a separately secured or separately occurred portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with the purpose to commit in the habitation any criminal offense."

{¶ 39} Clark argues that his burglary convictions are against the manifest weight of the evidence primarily because only fingerprint evidence was used to convict him. Clark asserts this is insufficient evidence because there were no witnesses that identified Clark as a trespasser in the homes and no items of property were recovered from Clark. Clark further asserts that the fingerprint evidence was insufficient because the prints taken from the crime scenes were old and somewhat blurry, and only one print match was identified by the State's witness regarding the incidents involving Victim No. 1 and two for Victim No. 2. Clark goes on to attack the credibility of the fingerprint evidence — much of the specifics of which were not presented to the jury at trial.

{¶ 40} Contrary to Clerk's argument, the Supreme Court of Ohio has held that fingerprint evidence alone is sufficient to establish identity for a burglary conviction. *State v. Miller*, 49 Ohio St.2d 198, 361 N.E.2d 419 (1977) at the syllabus, *sentence vacated on other grounds*, 438 U.S. 911 (1978). The *Miller* Court established that review of fingerprint evidence should focus on whether

> attendant circumstances, such as the location of the accused's alleged fingerprint, the character of the premises where the print was found, and the accessibility of the general public to the object on which

the print was impressed are sufficient to justify the trier of fact to conclude not only that the accused was at the scene of the crime when it was committed, but also that the accused was the criminal agent.

*Id.* at 202-203, citing *Avent v. Commonwealth*, 209 Va. 474 (1968); and *McCargo v. State*, 3 Md. App. 646 (1968). Courts have continued to apply this case-by-case analysis when examining convictions based on fingerprint evidence. *See State v. Martemus*, 2011-Ohio-5844, ¶ 10-13 (8th Dist.); and *State v. Suloff*, 2019-Ohio-4607 (5th Dist.).

{¶ 41} Here, fingerprint examiner Berry-Wheatley testified that she received several sets of fingerprints taken from the scenes of the home invasions. These prints were collected by crime scene unit investigators who also testified at trial. Carla Crowell, a former crime scene unit investigator, testified that she responded to Victim No. 1's residence and collected fingerprints from items the victim had indicated were disturbed during the burglary — a watch box, a flower vase, and a file cabinet. Cesar Herrera, a former crime scene unit investigator, testified that he responded to Victim No. 2's home. He collected fingerprints from the rear window, a suspected point of entry, and items that the victim indicated had been moved during the burglary. This included a bottle of vodka in the kitchen and the handle of a vacuum cleaner in the upstairs bedroom.

{¶ 42} Berry-Wheatley testified that she compared the fingerprints she received to known fingerprints taken from Clark. She testified that she used a process of examination called "ACE-V." She described this as a standardized process used for comparing fingerprints that consists of four steps: analysis, comparison,

evaluation, and verification. She was able to determine that the fingerprint taken from the displaced watch box in Victim No. 1's home matched those prints taken from Clark. She testified the same for the print taken from the bottle of vodka in Victim No. 2's home. Her results were independently verified by another fingerprint examiner.

{¶ 43} Both victims testified that these items were moved while the victims were gone from their homes. Both victims also testified that they did not know Clark and they did not give him permission to be in their homes. This evidence establishes that Clark was present in the homes of these victims without permission and a reasonable inference can be drawn that Clark was there to commit theft offenses. The jury was free to believe this evidence related to Victims No. 1 and No. 2 in finding Clark guilty because the trier of fact resolves issues of credibility and is free to believe or disbelieve the testimony presented. *State v. Jones*, 2020-Ohio-3367, ¶ 85 (8th Dist.), quoting *State v. Sheline*, 2019-Ohio-528, ¶ 100 (8th Dist.), quoting *State v. Colvin*, 2005-Ohio-1448, ¶ 34 (10th Dist.).

{¶ 44} On appeal Clark takes issue with the ACE-V process and points to other cases discussing articles that were not presented to the jury in Clark's case that found that the ACE-V method could have a relatively high error rate in some circumstances. *See, e.g., United States v. Bonds*, 922 F.3d 343 (7th Cir. 2019), citing The President's Council of Advisors on Science and Technology, *Forensic Science in the Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods*, 87-103 (2016) obamawhitehouse.archives.gov/sites/default/files/microsites/ostp/

PCAST/pcast_forensic_science_report_final.pdf (accessed August 19, 2024) [https://perma.cc/FFT8-YUBA]. Yet, Clark did not challenge the admissibility of the fingerprint evidence prior to or during trial. Clark questioned Berry-Wheatley on the quality of the fingerprints taken from the scenes of the crimes and alluded to the shortcomings of fingerprint comparisons, but the statistical analysis Clark advances on appeal was not presented to the jury. Consequently, we reject the argument on appeal challenging the manifest weight of the evidence.

{¶ 45} We do not find that Clark's convictions are against the manifest weight of the evidence. Berry-Wheatley testified that the fingerprint samples taken from the crime scenes were of sufficient quality for comparison. Clark has not created sufficient doubt about those identifications either here or at trial to find that the jury clearly lost its way in convicting him.

{¶ 46} Clark also argues that the jury's verdicts were inconsistent and points to this as a reason for this court to find that his convictions are against the manifest weight. However, this court has previously found that counts are generally independent from one another and differing verdicts on independent counts do not mean that a jury clearly lost its way.

> Inconsistent verdicts on different counts of a multi-count indictment do not justify overturning a verdict of guilt. The rationale behind upholding inconsistent verdicts among multiple counts was addressed by the U.S. Supreme Court in *United States v. Powell*, [469 U.S. 57, 68 (1984)] where the Court explained that juries can reach inconsistent verdicts for any number of reasons, including mistake, compromise, and leniency. The Court further held that it would be incongruous for a defendant to accept the benefits of an inconsistent verdict without also being required to accept the burden of such verdicts.

*State v. Taylor*, 2008-Ohio-1626, ¶ 10 (8th Dist.).

{¶ 47} Clark argues that the jury rejected the fingerprint evidence presented in Victim No. 3's case, so they clearly did not find it credible, and it must be rejected in the other cases. Simply put, we do not know why the jury chose to find Clark not guilty of the offenses related to Victim No. 3 while finding that he did commit the burglary offenses related to Victims No. 1 and No. 2 beyond a reasonable doubt. It is pure speculation on Clark's part that the jury verdicts are inconsistent based on the fingerprint evidence adduced at trial. The same is true for the jury finding Clark not guilty of the theft offenses of which he was charged while finding him guilty of the burglary offenses. "'Juries can reach inconsistent verdicts for any number of reasons, including mistake, compromise, and leniency.'" *State v. Wells*, 2021-Ohio-2585, ¶ 40 (8th Dist.), quoting *State v. Taylor*, 2008-Ohio-1626, ¶10 (8th Dist.). This does not lead to the conclusion that the verdicts are against the manifest weight of the evidence. *Id.,* quoting *State v. Jones*, 2019-Ohio-5237, ¶ 33 (8th Dist.), citing *State v. Norman*, 2011-Ohio-2870, ¶ 14 (10th Dist.); *State v. Gravelle*, 2009-Ohio-1533, ¶ 76-77 (6th Dist.); *State v. Parker*, 2008-Ohio-3538, ¶ 22-25 (8th Dist.); and *State v. King*, 2010-Ohio-2402, ¶ 32-34 (5th Dist.).

{¶ 48} Based on this evidence and testimony, and after reviewing the evidence adduced in this case under the standard established in *Miller*, we do not find that the jury clearly lost its way in convicting Clark of two counts of burglary

based on the fingerprint evidence that was admitted in these cases. Clark's second assignment of error is overruled.

{¶ 49} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

MARY EILEEN KILBANE, P.J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR